UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
MARSHA BATEMAN,

                Plaintiff,

     - against -

PROJECT HOSPITALITY, INC.,
JUNE DEUTSCH and DOES 1-10,

                Defendant.
-----------------------------------------------------X
MAUSKOPF, United States District Judge.

MEMORANDUM & ORDER
07-CV-2085 (RRM)(RML)


Plaintiff Marsha Bateman brings this action alleging violations of 42 U.S.C. § 1981 ("§

1981") ; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the Family Medical

Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*; New York State Human Rights Law § 296

("NYSHRL"); New York City Administrative Code § 8-107 ("NYCAC"); and the common law

of New York.[1] Bateman alleges that her employer, defendant Project Hospitality ("PH" or the

"Agency"), through its Human Resources Director, defendant June Deutsch, and certain

unnamed others ("Does 1-10") (PH, Deutsch and the Does are referred to collectively as

"Defendants"), created an actionably hostile work environment and conspired to terminate her

employment under circumstances evincing discriminatory animus on the basis of race, gender,

national origin, pregnancy, and physical disability. For the reasons below, Defendants' motion

for summary judgment is GRANTED in part and DENIED in part.

---

[1]     Bateman's Opposition papers refer also to 42 U.S.C. §§ 1978, 1983 and 1985. No such claims have been
pleaded on the face of the Amended Complaint and need not be addressed.

Bateman identifies as an African-American female of Jamaican descent.

On September 26, 2005, Bateman began her employment with PH, a Staten Island-based non-profit agency that provides services to homeless and needy persons. In her capacity as PH's Harm Reduction Coordinator, Bateman was responsible for the administration of the Harm Reduction Program, which included, among other things, oversight of counseling services, health assessments, and support group services. In that capacity, Bateman supervised a four-employee staff, consisting of three fulltime employees and one part-time employee. Pursuant to PH policy, Bateman's first six months of PH employment were probationary.

## A. Bateman's Illness

In December 2005, Bateman informed her supervisors that she was pregnant.[4] On January 12, 2006, approximately three-and-a-half months after beginning with PH, Bateman was hospitalized with *hyperemesis gravidum* (referred to herein as "hyperemesis") -- a pregnancy related illness causing severe nausea and dehydration. She remained hospitalized until January 17, 2006, when she was discharged. Thereafter, Bateman did not return to work at PH.

---

[2]     In reviewing the summary judgment record, this Court construes the evidence in the light most favorable to Bateman, and draws all reasonable inferences in her favor, while eschewing any attempt to determine credibility. *See, e.g., Vazquez v. Southside United States Hous. Dev. Fund. Corp.*, 2009 WL 2596490, at *6 (E.D.N.Y. Aug. 21, 2009). The following provides a summary of the relevant facts as to which the parties generally agree without citation to the record, except where indicated, but noting the evidence as to certain areas of disagreement.

[3]     The Court has reviewed the following summary judgment record: Defendants' Rule 56.1 Statement of Material Facts Not in Dispute; Plaintiff's Statement of Disputed and Undisputed Fact in Opposition; Defendants' Reply to Plaintiff's Rule 56.1 Counterstatement of Material Facts; the Declaration of Joan M. Gildride sworn Oct. 30, 2008 (with appended exhibits "A-R") (the "Gilbride Decl."); Declaration of Nkereuwem Umoh (with appended exhibits "1-22") (the "Umoh Decl."); Declaration of Joan M. Gilbride sworn Feb. 19, 2009 (with appended exhibits "S-X") (the "Supp. Gildbride Decl."); Defendants' Memorandum of Law; Plaintiff's Memorandum of Law; Defendants Memorandum of Law in Reply.

[4]     Although the parties' respective 56.1 statements fail to establish Bateman's due date, from the evidence presented, the Court presumes that Bateman's child was due in or about May/June 2006.

On or about January 17, 2006, PH became aware of Bateman's pregnancy-related complications, including her past history of miscarriages. Bateman's supervisor, Gina Cambria, contacted PH's Human Resources Director, June Deutsch, to convey her understanding that Bateman would be on indefinite leave and inquiring as to PH's policies in that regard.[5] June Deutsch's email response indicated that Bateman had acquired sufficient sick-time for full pay until approximately January 23, 2006, after which time PH's short-term disability coverage would provide payment coverage for up to 26 weeks. Deutsch further stated that the Family Medical Leave Act provided for up to 12 weeks of unpaid leave.

On or about January 19, 2006, Deutsch sent Bateman a package of materials, which included PH's written policies with respect to FMLA leave, disability, and medical benefits; as well as the necessary application for those benefits, which paperwork was completed by Bateman and her physician and returned to PH on or about January 24, 2006.

**B.  FMLA, NYS Disability & Medical Coverage Benefits**

Despite Bateman's ineligibility for certain benefits, including FMLA leave, the record indicates that PH made exceptions in her case. For example, PH's written leave policy, which Bateman admittedly reviewed upon the commencement of her employment, states as follows:

> FMLA requires covered employers to provide up to 12 weeks of unpaid, job protected leave to eligible employees for certain family and medical reasons. Employees are eligible if they have worked for a covered employer for at least one year, and for 1250 hours over the previous 12 months, and if there are at least 50 employees within 75 miles. (Umoh

---

[5] An email dated January 17, 2006, from Bateman's supervisor, Gina Cambria to June Deutsch reads, in relevant part, as follows:

June:

It appears that Marsha Bateman will be out indefinitely – She has been hospitalized since Friday at St. Barnabus Hospital in New Jersey due to complications with her pregnancy. As far as I know, her doctor is putting her on bedrest. She is 3 months pregnant at this point and has had several miscarriages in the past. I am not in my office and not sure of the agency policy in terms of a leave as Marsha has only worked here for 3 months thus far. (Gildbride Decl., Exh. K email from Cabria to Deutsch dated January 17, 2006).

Decl., Exh. 14, Benefits information package mailed to Bateman January 19, 2006).

There is no dispute that Bateman – as a mere three-and-a-half month employee – was ineligible for FMLA coverage. Nonetheless, PH, and Deutsch specifically, approved Bateman's FMLA leave as an exception to the Agency's written policy. Accordingly, despite her ineligibility, Bateman was afforded 12 weeks of employment-protected leave during her recuperation. In addition to deeming Bateman FMLA eligible, Deutsch, by letter dated February 24, 2006, also approved the extension of medical insurance benefits until after childbirth, at no additional cost to Bateman; such benefits would otherwise have expired prior to childbirth, at the conclusion of the 12-week FMLA leave period.

By letter dated March 22, 2006, Deutsch confirmed that Bateman's medical insurance would remain in place until after childbirth, but informed Bateman that her FMLA leave period would expire as of April 13, 2006 – at which time Bateman's employment would terminate.

By written letter dated April 9, 2006, Bateman objected to her impending termination and expressed her desire to return to her fulltime position upon her recovery. That letter, however, did not indicate when Bateman expected to return. Bateman's letter, which was addressed to and received by June Deutsch, was subsequently annotated with June Deutsch's handwritten notes, which notes purport to memorialize Deutsch's telephone discussion with Bateman concerning her impending termination. According to Deutsch's notes, she informed Bateman that she remained an employee in good-standing, and that she had been invited to "reapply" for another position upon her recovery. It is undisputed that Bateman did not reapply.

Bateman's employment was terminated on April 13, 2006, immediately upon expiration of the 12-week FMLA leave period. Nonetheless, Bateman's position as Harm Reduction Coordinator remained unfilled until September 2006. PH does not dispute the fact that after

4

Bateman's termination, the Agency never contacted Bateman to determine whether she was willing and able to return to her still vacant position. Ultimately, on September 28, 2006, PH hired Rosario Lopez-Rivera, a self-described black-Latina of Puerto Rican descent, as Bateman's replacement.

It is PH's position that Bateman's termination was necessary, as her prolonged absence from the essential Harm Reduction Coordinator post created an unsustainable economic hardship for the Agency. To dispel any notions of discriminatory action, PH notes its documented generosity in providing Bateman full FMLA leave, despite her ineligibility, as well as its largesse in extending her full medical and other disability benefits without any legal obligation to do so. Moreover, PH provides evidence of its racially and ethnically diverse workforce and contrasts Bateman's discrimination claims with evidence of other employees in Bateman's protected class who did enjoy extended medical leave, but who, unlike Bateman, qualified for such additional benefits on the basis of their many years of service. Finally, PH suggests that Bateman's failure to communicate her intention to return to work left the Agency with no choice but to seek a permanent replacement, a circumstance PH suggests may have been avoided had Bateman not rebuffed their repeated, good-faith efforts to communicate with her during her convalescence.

Bateman, on the other hand, alleges that PH's protestations of non-discrimination are false and that its proffered reasons for her termination are pretextual. It is Bateman's contention that PH unilaterally forced FMLA leave upon her, despite her ineligibility, to provide PH time to remove her from the workplace while seeking her permanent replacement, meanwhile cloaking their predetermined scheme with the gloss of generosity. In support, Bateman cites the fact that in early-February 2006, within three weeks of implementing FMLA leave, PH had commenced a

public job search to hire her permanent replacement. As such, Bateman claims that FMLA leave was merely a rouse, and that PH never had any intention of allowing her to return.

Further, Bateman alleges that upon her discharge from the hospital on January 17, 2006, she communicated to her PH supervisor, her desire to perform certain of her tasks from home, but that PH rejected her offer. As to communications during her convalescence, Bateman admits that PH supervisors did contact her several times via telephone and email, but that they consistently made insensitive, harsh and unreasonable demands that she provide a date certain for her return to fulltime, onsite employment. Bateman suggests that PH's aggressive inquiries were not genuine, and that her inability to provide a concrete answer under the circumstances of her continuing illness merely provided PH with the necessary pretext to terminate her employment. Finally, Bateman rejects PH's comparator evidence of allegedly non-discriminatory treatment of other black employees in the medical disability leave context; as well as PH's attempt to distinguish her circumstances from those of certain white female employees, which employees received contrastingly favorable treatment in connection with nearly identical pregnancy complications.

For the foregoing reasons, Bateman brings a variety of discrimination claims.

## DISCUSSION

In the summary judgment context, the evidence adduced must be construed in the light most favorable to Bateman, as the non-movant. *See, e.g., Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). Summary judgment is appropriate only where there exists no genuine issue of material fact, and the onus to establish the absence of such factual issues falls squarely upon Defendants as the moving parties. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such showing, the onus shifts to Bateman to present evidence sufficient to satisfy

every element of the claim. In so doing, Bateman is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." Id. at 324. But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in Bateman's favor. *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 249-50 (1986).

In discrimination cases, the merits typically turn upon an employer's intent, necessitating abundant caution in granting summary judgment for the employer. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Naturally, where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment. *Id.*

## A. Common Allegations of Pregnancy/Disability Discrimination

At heart, Bateman's lawsuit is one for pregnancy-related discrimination. As such, each of Bateman's overlapping claims – brought variously under the anti-discrimination protections afforded by Title VII, the ADA, NYSHRL and NYCAC – require a causal connection between Bateman's termination and facts sufficient to give rise to an inference of discriminatory motive, without which each of these claims must fail. *See, e.g., Lacoparra v. Pergament Home Centers, Inc.*, 982 F. Supp. 213, 222, 225, 226-27 (S.D.N.Y. 1999) (analyzing pregnancy discrimination claims brought pursuant to Title VII, the ADA, and the New York State Human Rights Law and implicitly recognizing that inferable discrimination is a predicate to each). Upon this Court's review of the record, and for the reasons discussed below, material questions of fact exist, which,

if true, are sufficient to give rise to inferences of discrimination, thus satisfying the causation element essential to Bateman's discrimination claims.

This Court identifies several facts which may, inferentially, support the view that PH perceived Bateman's pregnancy as a potential business disruption and/or that it terminated her from a discriminatory motive, including: (1) PH's past experiences with pregnant employees; (2) the irregular circumstances surrounding PH's extension of FMLA leave; (3) PH's own characterization that Bateman's FMLA leave was predicated on her inability "to perform the essential functions of [her] job;" (4) PH's decision to countermand its written policy and invoke FMLA leave in lieu of available short-term alternatives; (5) PH's refusal to extend Bateman's leave, despite extending medical leave to other employees; (6) PH's determination, made prior to the expiration of Bateman's FMLA leave, to terminate her employment despite her stated desire to remain with the Agency; and (7) PH's insistence on terminating Bateman for "economic" reasons, despite (i) identifying Bateman as a non-essential employee, and (ii) PH's failure to fill Bateman's position until late-September 2006, more than five-and-a-half months after her termination. This non-exhaustive listing of circumstantial factors taken in context, and in combination, precludes summary judgment.

### 1. PH's past-experience with employee pregnancy

Between 2003 and 2006, Joanne Lofaso, a PH clerical employee, requested and received nine months of pregnancy-related leave, due to pregnancy complications. During that time, PH generously provided Lafaso with medical benefits and filled her position with a temporary employee. As a factual matter, PH's generosity cuts both ways. Based on PH's experience with Lafaso, there is a plausible factual dispute as to whether the Agency was reluctant to further suffer the disruption and expense associated with accommodating complicated and debilitating

pregnancies.[6]  A jury might reasonably infer that PH – once bitten, twice shy – placed Bateman on immediate leave, having no intention whatsoever of allowing her to return.

### 2. FMLA leave

PH's grant of FMLA leave to Bateman can be viewed with skepticism in several respects. First, the parties concede that Bateman, as a new, probationary employee, was not eligible for FMLA leave under either federal law or PH employment policies.  Second, PH's insistence on 12 weeks of leave could be viewed as a substantial overreaction for what reasonably appeared, at least as of early-January, 2006, to be a temporary condition.[7]  Indeed, Bateman testified that she expressed confusion and uneasiness at what she considered "pressure" to accept a prolonged leave from new, and still probationary, employment because of typical pregnancy symptoms.[8] Further, Bateman claims that she questioned the need for extended leave given the availability of less drastic remedies; specifically, the application of accrued sick-days, personal days and

---

[6]      In 2003, Lofaso requested and received a three-month FMLA leave; again, in 2006, Lofaso asked for and received a six-month FMLA leave.  During her total nine months of leave, Lafaso's PH employment was protected; she received medical insurance benefits at no cost; and, in connection with her 2006 leave, was granted disability payments.  Further, for her 2006 leave, it was necessary for Lofaso's clerical duties as a payroll associate to be covered by the temporary return of a retired, former PH employee – which temporary employee was presumably paid for her services.  Thus, Lafaso's absence no doubt constituted an inconvenience – or at the very least a disruption -- to PH's business affairs, never mind the substantial expense of maintaining Lafaso's benefits and hiring replacement employees during that extended period.  Having experienced that degree of inconvenience, disruption, and expense in connection with a mere clerical employee, it may reasonably be argued that Defendants were not eager to repeat that experience with Bateman – an allegedly more vital supervisory employee.

[7]      Indeed, Bateman's deposition testimony, appended on summary judgment (see Gilbride Decl., Exh. E), indicates that her condition generally improved after her hospital discharge:

> Q. When they released you from the hospital, had the vomiting gotten less?
> A. Yes
> Q. How often were you vomiting when they released you from the hospital?
> I would say around three to four times a day.
> Q. And how long did that continue?
> A. Probably around two more weeks.
> Q. And after two weeks, how frequent was it?
> A. It had went down to probably one a day. (Gilbride Decl., Exh E., Bateman Dep. at 166).

[8]      Q. Did you ever tell Project Hospitality that as of this date I will be coming back to the office?
A. No, I didn't give anybody a date because I didn't have it.  But considering that throwing up is a part of a pregnancy for me I didn't see where I was going to be out very long. (Gilbride Decl., Exh. E, Bateman Dep. at 152-53).

9

vacation time. Such alternative remedies Bateman then believed would have been sufficient to allow her to recuperate – at least to a level that would have permitted her return to work with some reasonable accommodation.[9]

Having reviewed the record, the Court agrees that the facts and circumstances of Bateman's FMLA leave are sufficiently irregular to preclude summary judgment. For example, this Court is satisfied that extended FMLA leave was prompted not at Bateman's request, but upon the unsolicited advice of PH's Human Resources Director, June Deutsch.[10] More importantly, a good-faith basis for such unilateral insistence is not self-evident given available alternatives. Contrary to its own policy, PH failed to exhaust Bateman's available non-FMLA time. By failing to apply even a single sick-day, vacation day, or personal day to Bateman's leave,[11] PH was in a position to terminate Bateman exactly 12 weeks (and not one day more) after her first absence – which they did.[12] Though not conclusive of discrimination, PH's disregard of its own policy might reasonably supports a view that Bateman's FMLA leave – for

---

[9]     Although Bateman concedes that she was sicker than she initially believed and that she was not, in fact, able to return to PH within the time she anticipated, those circumstances became apparent only after she was removed from PH. The import is that PH's insistence that she take extended leave, rather than exhaust her short-term options, may be viewed as indicative of their predetermined intention to remove her from her position – that PH may or may not have accurately guessed the actual severity of her illness was merely coincidental and that their discriminatory motive should not be excused by the happenstance development of a of non-discriminatory reason that was not, in fact, the actual basis for granting such leave.

[10]     Q. At any point in your conversations, did she request to go out on FMLA?
A. No. She was placed on FMLA. (Gilbride Decl., Exh. I, Deutsch Dep. at 10).

[11]     PH's staff handbook states in relevant part as follows:

          ... If an employee is entitled to paid leave under another employment policy (such as sick/personal days or vacation) the employee must take the earned paid leave first. The balance of the twelve (12) weeks of Family and Medical leave will be unpaid. (Umoh Decl., Ex. 14, Benefits information package mailed to Bateman January 19, 2006).

[12]     Reference to PH's "Staff Handbook and Benefits Guide" suggests that new PH "management" employees, as Bateman was, are entitled to three (3) personal days, 12 days of sick leave, and 20 days of vacation time. How and when such days accrue is unclear from the documentary evidence provided, except that the calculation period runs from the employment date, that such days may not to be used in the first three months of employment, which limitation was inapplicable in Bateman's case, as she had been employed for more than three months as of her absence on January 12, 2006. (Umoh Decl., Exh. 10, Staff Handbook and Benefits Guide).

which she was not actually eligible – was motivated not by largesse, but as a dissembling pretext for her discriminatory termination. A triable issue as to PH's motive is therefore raised.

### 3. Short-term disability leave

In addition to the noted irregularities, PH's lack of willingness to truly accommodate pregnancy-related disabilities is further supported by PH's refusal to extend Bateman's leave when her health did not improve; an action also ostensibly at odds with its written policy and contrary to its past-practices with respect to other pregnant employees, including Lafaso.

PH's written policies provide for up to six-months of "Short Term Disability Leave," that, unlike FMLA leave, accrues after only 30 days of employment. PH's Staff Handbook states, in relevant part, as follows:

> Short term disability benefits go into effect after 30 days of employment. If you do not work for seven consecutive days because of illness or injury, you may become eligible for disability pay for up to 26 weeks in accordance with New York State law. Leaves of absence due to disability are limited to a maximum period of six months. PH will make every effort to reinstate an employee returning from such a leave to the same or a substantially equivalent position, provided a position exists. If an employee is on disability longer than the maximum 6-month period there will be a separation of employment. Short-term disability may be covered under the Family Medical Leave Act. Employees will be paid for any earned vacation, sick, and personal time at the onset of their disability period. (Umoh Decl., Ex. 10, Staff Handbook and Benefits Guide at 25).

PH denies that Bateman was eligible for non-FMLA short term disability leave, although its basis for such a position is unclear in light of (a) Bateman's satisfaction of the 30-day provision in the above written policy, and (b) the fact that such a six-month leave period was clearly afforded to Lafaso, an employee who suffered similar pregnancy complications to Bateman. PH attempts to distinguish Bateman from Lafaso in several key respects, most notably length of

service and Lafaso's express request for such leave.[13] On those grounds, PH essentially argues that it was privileged to discretionarily grant Lafaso's leave while denying Bateman's. PH's attempt to distinguish Lafaso from Bateman, however, raises fact and credibility issues better left for a jury.

### 4. Intention to terminate Bateman's employment

Whether or not PH policies contemplated additional leave, PH claims that Bateman failed to adequately communicate both her desire *and* ability to return by a date certain. Absent that information, PH contends that it was unable to keep Bateman's position open after expiration of the 12-week FMLA period. While that may ultimately prove true, Bateman has raised sufficient questions here as well.

Most troubling is the timing of PH's job search. As early as February 5, 2006 – three weeks after Bateman began her FMLA leave – PH posted her position in several newspapers. Although PH argues that it merely sought a temporary replacement, it is difficult to reconcile exactly how PH intended to fill Bateman's position on a temporary basis. By its own admission, PH characterizes Bateman's position as a managerial post, involving, among other things, complex coordination between PH's clients and outside programs and agencies, and the supervision of a four-employee department. For PH to expend the time and resources necessary to train a temporary replacement only to remove them in less than ninety days seems unlikely –

---

[13]    This Court questions whether PH's short term disability benefit is discretionary at all. Despite language that an employee "*may* become eligible," nothing in the short term disability provision makes such disability leave expressly discretionary; at the very least, there is nothing that circumscribes grounds for denial, a fact which would tend to render its application arbitrary, and susceptible to discriminatory application. Second, with respect to length of service, there is no doubt that Lafaso served six years, while Bateman merely served three-and-a-half months. Nonetheless, the short-term disability provision requires only 30-days employment, which was more than satisfied here. Third, assuming that Lafaso did expressly request a six-month leave, the fact that Bateman allegedly did not is not dispositive – initially, Bateman did not request leave at all, yet PH granted a 12-week leave of its own initiative. Thus, this Court is not persuaded that Bateman's purported failure to request additional leave upon expiration of the 12-week FMLA period is an appropriate basis for termination. If PH had been so inclined, there was nothing to prevent it from unilaterally extending Bateman's leave. Indeed, granting additional leave of its own accord would have been consistent with its established pattern of conduct.

12

or grossly inefficient, at the very least. The facts therefore suggest that – within three weeks of Bateman's departure – PH determined to remove her in favor of a new hire. Such action, if true, seems directly contrary to both the letter and spirit of the FMLA, and would undercut any rational, good-faith basis for granting FMLA leave in the first instance. A question of intent is therefore raised.

The timing of PH's job search aside, Defendants' claim that Bateman's termination was economically necessary is undermined by two facts: (1) that PH identified Bateman as a non-essential employee for purposes of FMLA leave, and (2) that the Harm Reduction Coordinator position remained vacant until September 28, 2006 – five-and-a-half months after Bateman's FMLA leave expired. Again, the facts raise questions of intent better determined by a jury.

If Bateman was *not* an "essential" employee – as PH expressly represented she was not – then granting her further leave should not have presented an economic hardship. Indeed, PH previously accommodated Lafaso, a non-essential employee, in precisely that manner. If on the other hand, Bateman's position *was* critical, it is curious that her position remained open until late-September, 2006 – a date this Court presumes was well after Bateman's childbirth and presumably after her pregnancy-related hyperemisis abated. Moreover, having obviously failed to identify a qualified replacement, PH cites no reason why Bateman should not have been reinstated. After all, Bateman's stated desire to return is not in dispute, PH admits that her qualifications were beyond reproach and that she remained in "good standing" while on leave. Further, PH would likely have benefitted from Bateman's reinstatement by avoiding the inefficiency and expense of training a new employee to serve in so complex a managerial position. While Bateman establishes no affirmative duty requiring PH to reach out to her, under these circumstances, the fact that PH chose not to suggests an aversion to Bateman's return that

goes beyond mere economic and logistical practicalities. As such, Bateman has raised sufficient facts from which a jury could infer a discriminatory motive for her termination. Accordingly, for these reasons and for those discussed below, Defendants' motion for summary judgment must be denied.

**B. Title VII, the Pregnancy Discrimination Act, NYSHRL and NYCAC**

       *1. Pregnancy discrimination*

Title VII, as amended by the Pregnancy Discrimination Act (the "PDA"), 42 U.S.C. § 2000e(k), prohibits pregnancy-based employment discrimination, as do both NYSHRL and NYCAC. *See Reilly v. Revlon*, 620 F. Supp. 2d 524, *546 (S.D.N.Y. 2009) (analyzing PDA and NYAC pregnancy discrimination claims); *Kunp v. Xyvision, Inc.*, 733 F. Supp. 554, 559 (E.D.N.Y. 1990) (analyzing NYSHRL pregnancy discrimination claim); *see also Dumoulin v. Formica*, 968 F. Supp. 68, 69-70 (N.D.N.Y. 2008) (same). As with more traditional Title VII claims, the Court's analysis of pregnancy-related discrimination claims under the PDA, NYSHRL and the NYCAC track the oft-cited burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 63-64 (2d Cir. 1995); *see also Reilly*, 620 F. Supp. 2d at *545; *Dumoulin*, 968 F. Supp. at 69-70.

Pursuant to *McDonnell Douglas*, Bateman must show (1) that she is a member of a protected class; (2) that she has performed her job satisfactorily; (3) that she has suffered an adverse employment action; and that (4) that action occurred under circumstances giving rise to an inference of discrimination. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802); *Ganzy v. Sun Chemical Corp.*, No. 06-CV-3424, 2008 WL 3286262, at *4 (E.D.N.Y. Aug. 8, 2008). If Batman can do so, the burden then shifts to Defendants to articulate "some legitimate, non-discriminatory reason" for their action.

*McDonnell Douglas*, 411 U.S. at 802. Should Defendants carry this burden Bateman must then have an opportunity to prove by a preponderance of the evidence that Defendants' legitimate reasons were not their true reasons, but were merely a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, "the ultimate burden" of persuading the trier of fact that Defendants intentionally discriminated against the plaintiff remains at all times with Bateman. *Burdine*, 450 U.S. at 253.

In this case there is little dispute that, with respect to pregnancy discrimination, Bateman's *prima facie* case is satisfied: she was pregnant at the time PH terminated her employment; she was well-qualified for her position; she was terminated while on pregnancy-related leave and replaced by a non-pregnant employee; moreover, for the reasons discussed more fully above, the circumstances of her termination, if established, sufficiently give rise to a reasonable inference of pregnancy-related discrimination. PH's motion for summary judgment on Bateman's Title VII, PDA, NYSHRL and NYCAC claims is therefore denied. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

### 2. Race and national origin discrimination

PH's motion for summary judgment on Bateman's Title VII, 42 U.S.C. § 1981, NYSHRL and NYCAC-based race and national origin claims is also denied. Under *McDonnell Douglas*, which applies equally in the race/national origin context[14], there is no dispute that Bateman, as an African-American of Jamaican descent, is member of protected class, that she was well-qualified for her position and that she suffered an adverse employment action. To satisfy the essential fourth element of her prima facie case, Bateman contends that race and national origin discrimination is inferable because of two undisputed facts: first, that Lafaso, whose pregnancy

---

[14] For convenience sake, this Court regards "national origin" as synonymous with "ethnicity." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J. concurring).

15

PH did accommodate, was white; and second, that Bateman was replaced in favor of a candidate of a different racial/ethnic background; specifically, a black-Latina of Puerto Rican descent.

PH argues that Bateman's prima facie case fails to establish an inference of discrimination because she, and her replacement, Rosario Lopez-Rivera, are of the same protected class. This Court cannot agree. From the record, Lopez-Rivera self-identifies as a "black-Latina," but the fact that both she and Bateman are "black" is only part of the identity equation. PH puts forth no case law to support the simplistic proposition that an African-American of Jamaican descent and a black-Latina of Puerto-Rican descent are synonymous for purposes of Title VII and the like. Alternatively, PH would have this Court recharacterize both Bateman and Lopez-Rivera as African-American Caribbeans. This Court declines to do so.

Next, PH argues that Bateman cannot establish an inference of discrimination in the absence of any direct evidence of racial/ethnic bias, and cites the diversity of its workforce and its generous treatment of other African-American employees, while distinguishing Bateman from allegedly favored employees on the basis of substantial differences in job descriptions and lengths of service. On each of these points, this Court finds material questions of fact sufficient to preclude summary judgment.

Discriminatory intent may be shown through circumstantial, rather than direct evidence – smoking-gun evidence of bias being a rare exception. *See Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 676 (S.D.N.Y. 1995) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). Thus, Bateman's failure to attribute racial or ethnic slurs to PH supervisors is not dispositive. Second, a diverse workforce can undercut a claim of race/ethnic bias, see *Liburd v. Bronx Lebanon Hosp. Center*, No. 07-CV-11316, 2009 WL 900739, at *5 (S.D.N.Y. April 3, 2009), but workplace diversity, by itself, does not preclude the exercise of

16

discriminatory animus, and is not dispositive where, as here, the employer's proffered reasons for termination have been sufficiently cast into doubt. *Compare Liburd*, 2009 WL 900739 (dismissing race claims in light of strong evidence of workplace diversity and finding no basis upon which to doubt defendants non-discriminatory basis for plaintiff's termination); *Noyer v. Viacom, Inc.*, 22 F. Supp. 2d 301, 307 (S.D.N.Y. 1998) (dismissing gender and pregnancy discrimination claims where half of the defendant's executives were women, and where plaintiff had been replaced by a female employee who had just returned from maternity leave). Finally, the fact that other African-American or black employees were favorably treated in connection with medical disability leave and benefits does not warrant summary judgment. Bateman does not allege that PH treats its white employees better in all respects than its black employees, but rather that it does so specifically with respect to pregnancy disability leave.[15] In this regard, PH's comparator example, which involves the grant of generous medical disability leave to a male of African descent, is, for obvious reasons, of limited relevance.

More relevant to the question of racial or ethnic discrimination is Lafaso's case. Lafaso, a white employee, was granted a total of nine months of fully protected, pregnancy-related employment leave. Indeed, six months of that leave were granted consecutively. During that time, PH made no efforts to replace Lafaso. Instead PH, at its own expense, made alternative arrangements to ensure that Lafaso's work responsibilities were adequately covered during her recuperation. In stark contrast, Bateman, a black employee, was terminated upon expiration of only 12 weeks of leave. Despite PH's attempts to distinguish Lafaso and Bateman on the basis of their respective tenure, sufficient factual irregularities exist to raise a jury question on whether

---

[15]     Although the question of disparate racial/ethnic treatment in connection with pregnancy-related leave is, in this case, intertwined with questions of pregnancy discrimination, to be actionable race and/or ethnic bias need only be a contributing factor to the overall decision. *See Morris v. Northrop Grumman Corp.*. 37 F. Supp. 2d 556, 572 (E.D.N.Y. 1999). Accordingly, sufficient jury questions on this issue preclude summary judgment.

or not Bateman's termination was motivated, at least in part, by impermissible racial or ethnic considerations. *See Reeves*, 530 U.S. at 147. Although Bateman must carry a heavy burden at trial, summary judgment on Bateman's race, ethnicity and national origin claims is denied.

### 3. *Hostile work environment*

To assert a viable hostile work environment claim Bateman must establish that: (1) her workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive as to alter the conditions of his work environment; and (2) a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Further, the conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110. In other words, the first element of a hostile work environment claim requires allegations that demonstrate that the environment was *both* objectively and subjectively hostile. *See Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001).

To establish a hostile work environment claim Bateman "must prove more than a few isolated incidents of [discriminatory] enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986) (citations omitted). There is no "magic" threshold number of harassing incidents that are required to state a claim. *Butler v. Potter*, No. 06-CV-3828, 2009 WL 804722, at *14 (E.D.N.Y. Mar. 26, 2009). Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (quoting *Harris*, 510 U.S. at 23).

On the present record, there is nothing to suggest that Bateman was subjected to a hostile work environment: in fact, for 12-weeks, she wasn't in a work-environment at all. Although Bateman complains that during her convalescence she was peppered by phone calls from her PH supervisors, each of whom demanded updates as to her physical condition and her expected return date, there is nothing to suggest that such brief and sporadic communications were unduly harassing or menacing. Neither the FMLA nor any other federal or state provision provides indefinite leave, nor does it immunize employees from contact by their employers. Given continuing business concerns, every employer has a right to know when they can reasonably expect their employee's return, and may make such periodic inquires as reasonably necessary to obtain that information. *See, e.g., Wisneski v. Nassau Health Care Corp.*, 296 F. Supp. 2d 367, 374 (E.D.N.Y. 2003) (ADA does not require an employer to grant an indefinite leave of absence). Bateman's objections to PH's communications, as alleged, do nothing to suggest a hostile work environment. Accordingly, Bateman's Title VII hostile work environment claim is dismissed.

## C. **ADA and NYSHRL**

### 1. ADA & NYSHRL protected disabilities

PH seeks to dismiss Bateman's ADA claim on grounds that pregnancy is not an ADA-protected disability.[16] This Court disagrees. Although pregnancy is typically not a disability within the meaning of the ADA (*Johnson v. A.P. Prods. Ltd.*, 934 F. Supp. 625, 626 (S.D.N.Y. 1996); *Lacoparra v. Pregament Home Centers, Inc.*, 982 F. Supp. 213, 227 (S.D.N.Y. 1997); *Cvern v. Ent. Solutions Providers, Inc.*, No. 00-cv-8704, 2001 WL 533723, * 4 (S.D.N.Y. May 18, 2001), the predicate of Bateman's ADA claim is not pregnancy itself, but severe medical complications resulting from that pregnancy. Though the distinction between pregnancy and its complications may be a keen one, courts analyzing whether or not such complications may support an ADA claim have been increasingly receptive to the premise that certain physiological pregnancy consequences, if sufficiently severe, may indeed give rise to a protected disability within the meaning of the ADA. *See Cerrato v. Durham*, 941 F. Supp. 388, 392-94 (S.D.N.Y. 1996); *see also, Reilly*, 620 F. Supp. 2d at 541. Specifically courts have found that pregnancy complications can create physical impairments sufficient to substantially limit one or more major life activities (in this case, Bateman's ability to engage in her employment), thus satisfying the ADA's statutory definition of "disability." *See* 42 U.S.C. § 12102(2); *Garrett v. Chicago Reform Board of Trustees*, No. 95 C 7341, 1996 WL 411319, at * 1-2 (N.D. Ill. July 19, 1996).

---

[16]     In order to state a claim under the ADA, the plaintiff must adequately allege that she suffers from a "disability." The statute contains a three-part definition of the term "disability:"

> The term "disability" means, with respect to an individual-
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).

This Court is persuaded by the reasoning articulated in this developing line of cases, and finds that issues of fact remain sufficient to establish a triable ADA claim.

Moreover, the scope of disability protection under NYSHRL is broader than under the ADA, *Reilly*, 620 F. Supp. 2d at *541, thus a State law claim is viable even assuming the insufficiency of an ADA cause of action.

Pursuant to NYSHRL, disability is defined as:

> (a) a physical, mental or medical impairment resulting form anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques ... provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held. NYSHRL § 292(21).

"In other words, any 'medically diagnosable impairment' is a disability under NYSHRL." *Levine v. Smithtown Cent. Sch. Dist.*, 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008). Pregnancy-related illnesses, like hyperemesis, are diagnosable, medically recognized impairments that can result in severe physiological damage if untreated. *See Klausner v. Indus. Risk Insurers, Inc.*, No. 98-CV-1267, 1999 WL 476285, at *1 n.3 (S.D.N.Y. July 8, 1999) (recognizing *hyperemesis gravidum* as form of "severe morning sickness affecting about .3 percent of pregnancies," which can result in internal injuries and organ failure if untreated). In connection with her New York State disability claim, Bateman's treating physician affirmed a diagnosis of hyperemesis, which condition required Bateman's hospitalization from January 12, 2006 through January 17, 2006 and prevented her return to work on an ongoing basis. The requisites for establishing an NYSHRL-defined disability are thus well satisfied. PH's arguments to the contrary are unpersuasive.

### 2. *Perceived disability*

Alternatively, Bateman states a viable ADA and/or NYSHRL claim even if pregnancy-related hyperemesis is not a disability within the meaning of either federal or State statute. Here, the facts reasonably suggest that even if Bateman did not actually suffer a cognizable medical disability, PH *believed* that she did. In such case, federal and State protections are available to remedy any adverse employment action based upon an employer's subjective perception, or even misperception, of disability. 42 U.S.C. § 12102(2)(A-C); *see, e.g., Reilly*, 620 F. Supp. 2d at 541; *Walker v. Con. Ed. Co. of N.Y., Inc.*, No. 00-CV-8598, 2002 WL 31385830, at *4 n. 1 (S.D.N.Y. Oct. 22, 2002). As the court stated in *Cerrato, supra*, "this more subjective definition of disability is available to a plaintiff who suffers employment discrimination not on the basis of an actual disability but on the basis of myths, fears, and stereotypes that lead her employer to the erroneous conclusion that she is substantially impaired." 941 F. Supp. at 393-94. In this vein, Bateman essentially argues that PH – believing that she was indefinitely disabled and wholly unable to perform her job functions – opted to terminate her employment, rather than await her recuperation, or provide some other meaningful accommodation.

### 3. *Request for reasonable accommodation*

"In general ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004). Here, however, the record reveals a major factual dispute between the parties as to whether Bateman sought, and whether PH refused to grant her, a reasonable accommodation for her pregnancy-related illness. Although PH disputes that any such conversations ever took place, it is Bateman's testimony that upon her discharge from the hospital in or about January 19, 2006, she sought to do whatever tasks of her Harm Reduction

22

Coordinator responsibilities were possible from home – and that she made precisely such request

to Gina Cambria, her supervisor, by telephone. That request was apparently refused. Her offer

to work from home having been declined, Bateman recuperated at home until, March 2006,

when she was notified by letter of her impending "separation" from the Agency. By written

response dated April 9, 2006, prior to the expiration of her FMLA leave, Bateman expressed her

desire to retain her position, and that her inability to return immediately to such employment was

due only to her pregnancy-related complications:

> I received your letter regarding my pregnancy related illness that is
> causing my disability status. In your letter you indicated that since my
> doctor completed my return date after Family Medical Leave Act, then "I
> will separate from the agency". I am writing to inform you that I never
> consented to separating from the agency. Due to my severe illness during
> this high-risk pregnancy I was put on bed-rest. If not for this illness I
> would not be absent from my job. In fact I would return after my
> pregnancy related illness subsided. I hope this letter clarifies that I have
> not resigned from Project Hospitality as I left in good standing with you.
> (Gilbride Decl., Exh. N, letter from Bateman to Deutsch dated April 9,
> 2006).

PH is correct that Bateman's letter did not indicate her ability to return to fulltime, onsite

employment by April 13, 2006, her "separation" date.[17]  But, the letter *does* indicate Bateman's

desire to return upon her anticipated recuperation, and can reasonably be read to request

additional leave time – an ADA recognized accommodation, see *Powers v. Polygram Holding,*

---

[17]     The Court notes that although the ADA does not require an employer to grant "indefinite leave" to its
employees, and thus typically requires employees to propose an anticipated return date, see *Wiskneski*, 296 F. Supp.
2d at 374, the circumstances here present a unique case. Unlike other illnesses of permanent or indefinite duration,
Bateman's disability here, hyperemesis, was diagnosed as exclusively pregnancy-related and thus could reasonably
have been expected to subside at the conclusion of her pregnancy. As such, a further leave period would likely have
been necessary only until or shortly after childbirth, a date this Court presumes was in June 2006 – and which would
likely have required only an additional two months of leave. Accordingly, and from all obvious circumstances, the
contemplated period of additional leave was far from "indefinite." Whether PH satisfied its obligation to make
reasonable inquiry under the circumstances, or whether Bateman's alleged uncooperativeness provided a complete
defense to ADA liability, see e.g., *Donofrio v. New York Times*, No. 99-CV-1576, 2001 WL 1663314, at *7
(S.D.N.Y. Aug. 24, 2001), remains for the jury.

*Inc.*, 40 F. Supp. 2d 195, 199 (S.D.N.Y. 1999) – during which to fully recover. Thus, Bateman's

April 9, 2006 letter, viewed in the most favorable light, and in conjunction with her prior verbal

requests to perform at least certain of her tasks from home, is sufficient to raise a triable issues of

fact on whether or not Bateman satisfactorily made a request for accommodation as required by

the ADA.[18] *Compare Pellegrino v. County of Orange*, 313 F. Supp. 2d 303, 319 (S.D.N.Y.

2004) (finding no discriminatory intent from defendant employer's failure to extend pregnancy

leave for pregnancy-related complications, where employer provided plaintiff with extension

paperwork, which plaintiff then "inexplicably" ignored); *see also Rodal*, 369 F.3d at 120 (finding

that issues of fact as to whether plaintiff made a request for a part-time scheduling

accommodation precluded summary judgment); *Powers*, 40 F. Supp. 2d at 201-02.

**D. Individual Liability for Does 1-10**

Bateman presents neither argument nor evidence that Does 1-10, listed in the caption,

engaged in illegal conduct for which they are liable. Accordingly, summary judgment is granted

and those claims are dismissed. *See Feingold v. New York*, 366 F.2d 138, 157-158 (2d Cir.

2004) (dismissing generalized discrimination claims against unnamed defendants).

**E. Individual Liability for June Deutsch**

Bateman's Complaint fails to specify the basis for Bateman's individual liability, the

Court therefore focuses upon PH's summary judgment arguments, which exclusively address

---

[18]      Even assuming that Bateman's letter is not a sufficiently precise request for accommodation under the
ADA or NYSHRL, that fact alone does not end the inquiry.  In that case, there remain factual questions as to
whether PH fulfilled its duty to engage in an interactive process to determine, in good faith, whether or not a
reasonable accommodation could be made. *See Jacques v. DiMarzio, Inc.*, 200 F.Supp.2d 151, 171 (E.D.N.Y. 2002)
(citing *Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3d Cir. 1999)).  With respect to the ADA's requirement
for an "interactive process" between employers and employees, PH claims that it sent several letters to Bateman and
called her on several occasions, but was rebuffed or otherwise ignored.  If true, such facts may establish Bateman's
unwillingness to engage in the required process – a circumstance which may prove fatal to her ADA claim.  Despite
any prior recalcitrance, however, the record indicates that by April 9, 2006, prior to the expiration of her FMLA
leave, Bateman had opened the lines of communication.  Whether or not PH was, at that point, privileged to ignore
her belated overture cannot be determined as a matter of law and remains for the jury.

Deutsch's potential liability under NYSHRL and NYCAC. Although the NYSHRL and NYCAC do provide for individual liability, see *Cerrato*, 941 F. Supp. at 396-97 and *O'Gorman v. Holland*, No. 97-cv-0842, 2000 WL 134514, at *6 (S.D.N.Y. Feb. 3, 2000), Bateman fails to aver facts sufficient to establish Deutsch's actual participation in the alleged discriminatory acts complained of, an essential element for individual liability on these claims. *See Cerrato*, 941 F. Supp. at 396-97.

Bateman characterizes Deutsch's role as that of messenger; i.e., that as PH's Human Resources Director she merely relayed personnel decisions made by others. In that capacity she forwarded FMLA paperwork to Bateman and communicated news of Bateman's impending "separation" from the Agency. The record, however, does not indicate Deutsch's role, if any, in Bateman's actual firing or the hiring of her replacement (which hiring was apparently directed by Gina Cambria, not Deutsch), or that Deutsch had supervisory authority over Bateman or any other PH employee.[19] Moreover, there is no indication that Deutsch undertook any other affirmative conduct out of personal, discriminatory animus. As such, Bateman's allegations against Deutsch are insufficient to withstand summary judgment. *Compare Cerrato,* 941 F. Supp. at 396-97 (holding that defendant's role as mere messenger failed to establish the requisite degree of *actual participation* contemplated under the statute).

---

[19]     Deutsch testified that the termination of an employee is discussed amongst the executive staff, which she identified in deposition testimony as PH supervisor, "Jeff Rondanaro" and the "program area." Although Deutsch admits that she was present for such discussions, the record, as presented on summary judgment, does not establish that Deutsch had either input or ultimate decision-making authority in that regard.

## F. Remaining Claims

Bateman's remaining claims alleging retaliation under federal or State law and common law misrepresentation are dismissed. PH has set forth colorable and adequate legal and factual grounds for such dismissal, which arguments Bateman's opposition wholly ignores. Bateman is not *pro se*, but is instead represented by experienced, professional counsel. As such, it is not for this Court to fashion for her sufficient factual or legal grounds in opposition to summary judgment. Thus, having failed in any manner whatsoever to address PH's viable summary judgment arguments on these claims, they are deemed waived. *See, e.g., Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004); *Kamat v. Kurtha*, No. 05-cv-10618, 2009 WL 103643, at * 1 (S.D.N.Y. Jan. 15, 2009) (citing *Lyn v. Inc. Vill. of Hempstead*, No. 03-cv-5041, 2007 WL 1876502, at *52 n. 13 (E.D.N.Y. June 28, 2007)).

### CONCLUSION

For the reasons set forth above, summary judgment is GRANTED in part and DENIED in part. Bateman's claims as to the individual liability of Does 1-10 and June Deutsch, as well as her federal or State claims concerning hostile work environment, retaliation, and common law misrepresentation are dismissed. Summary judgment as to Bateman's various claims of disability, pregnancy, race, and national origin discrimination under § 1981, ADA, Title VII, NYSHRL, and NYCAC is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2009

ROSLYNN R. MAUSKOPF
United States District Judge